**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| K.T., a minor and heir of the Estate of Sandra Ramos; J.R. Thompson, solely in his capacity as custodial parent and next of friend of K.T.,<br><br>Plaintiff,<br><br>vs.<br><br>Devon Ramos, individually and as personal representative of the Estate of Gilbert Ramos; Maria Gonzalez; Christopher Dunagan; Marivel Ramos,<br><br>Defendants. | No. CV-11-156-PHX-LOA<br>No. CV-11-554-PHX-LOA<br>(Consolidated)<br><br>**ORDER** |

This case arises on the parties' request for settlement approval of this consolidated interpleader action. J.R. Thompson, conservator and father of K.T., a minor; Marivel Ramos, putative conservator and guardian[1] for Maria I. Gonzalez, an incapacitated adult and mother of the late Gilbert Ramos; and the remaining parties have petitioned the court for approval of their compromise agreement. A final settlement approval hearing was held on February

---

[1] On January 17, 2012, Marivel Ramos petitioned the Maricopa County Superior Court in Case No. PB2012-090038, requesting she be appointed conservator and guardian for her 78-year-old mother, Maria I. Gonzalez, who is currently living in an assisted-living facility and suffering from Alzheimer's dementia which prevents her from managing her own affairs and finances. (Defendants' Exhibit ("Exh.") A) An appointment hearing, presently uncontested, is scheduled for March 27, 2012 before a Superior Court commissioner.

2, 2012 in open court before the undersigned Magistrate Judge. At the hearing, counsel for all parties and K.T.'s conservator, J.R. Thompson, and Maria's presumed conservator, Marivel Ramos, were present. All parties have filed reports regarding the status of the parties' settlement. (Docs. 55-56, 58)  Pending for ruling are K.T.'s sealed Supplemental Motion for Approval of Minor's Settlement, doc. 57, and the sealed Stipulation for Distribution of Funds, doc. 60, which the Court has construed as a joint motion because it involves claims asserted on behalf of a minor and an incapacitated person. All parties have consented to magistrate-judge jurisdiction pursuant to 28 U.S.C. § 636(c). (Docs. 29; 29-1 at 1-3; 28 in CV-11-554-PHX-LOA)

## I. Background

This interpleader action arises from a tragic familial triple homicide and suicide. On or about September 21, 2010, Gilbert Ramos shot and killed Sandra Ramos and their two minor children and then killed himself. At the time of the shootings, Gilbert was married to Sandra with whom he had two young children and was employed by AMF Bowling Worldwide, Inc. ("AMF Bowling"). The children died at the scene and Sandra survived for a few days before she passed away from her injuries. Sandra's biological daughter, K.T.[2], now 16 years old and born from a prior marriage to J.R. Thompson, was not present at the time of the murders and suicide.

At the time of the shootings, Gilbert and his sister, Marivel Ramos, were reportedly the subjects of an insurance fraud investigation as a result of Gilbert's intentional damage to Marivel's automobile and a subsequent claim for payment by Marivel's auto insurance

---

[2] Counsel were previously ordered, doc. 36 at 5, to refer to the minor as "K.T." only in all public filings to safeguard her privacy interests pursuant to Rule 5.2(a)(3), "[a] rule that establishes a special approach and procedure for granting juvenile anonymity during litigation." *Doe ex rel. Doe v. Kamehameha Schools/Bernice Pauahi Bishop Estate*, 625 F.3d 1182, 1187 (9th Cir. 2010) (Chief Judge Kozinski, dissenting from denial of *en banc* review).

benefits. In his suicide note, Gilbert absolved Marivel of criminal complicity, admitted he intentionally damaged his sister's vehicle, confessed he told her someone had stolen it, and opined he "ruined [his] family financially[]" and was "sorry for what [he's] done and am about to do." (Supplement to Police Report, by Homicide Detective, T. Nelson, December 3, 2010.)

Gilbert's employer, AMF Bowling, maintained a 401(k) retirement plan for the benefit of its eligible employees, including Gilbert, whose account balance on December 30, 2010 was $77,158.84. (Doc. 1, ¶ 14 at 3)  According to AMF Bowling, before his marriage to Sandra, Gilbert designated his plan's beneficiaries as Maria Gonzalez, his mother; Devon Ramos, his adult son; Sandra Thompson, his then fiancee; and Christopher Dunagan, another adult son, as either primary and/or secondary beneficiaries with certain percentages designated for each that totaled 100 percent of the plan's benefits. (*Id*., ¶ 17 at 4[3])  Prior to the consolidation of this case with CV-11-554-PHX-LO, the assigned district judge granted AMF Bowling's Motion to Interplead Funds; authorized AMF Bowling to deposit the balance of the money in Gilbert's 401(k) plan and accrued interest ($62,113.70) into the District Court of Arizona's registry, after deducting AMF Bowling's attorneys' fees and costs in the amount of $10,610.00; dismissed AMF Bowling from the action with prejudice after the deposit of the interpled money; and enjoined all defendants, successors and assigns from instituting any action against AMF Bowling for the recovery of any amounts that were the subject of the interpleader action. (Docs. 25-26 in CV-11-156-PHX-LOA)

At the time of his death, Gilbert Ramos was insured by Liberty Life Assurance Company of Boston ("Liberty Life") under a renewable and convertible term life insurance policy in the amount of $100,000.00, Policy No. NF3-39621478. (Doc. 1, ¶ 17 in CV-11-554-PHX-LOA)  Before his marriage to Sandra, Gilbert designated Marivel Ramos, his sister, as the primary beneficiary, and Maria Gonzalez, his mother, as the contingent

---

[3] Early on in this ligation, Marivel Ramos and Maria Gonzalez contended that Gilbert Ramos failed to designate a beneficiary for his 401(k) plan. (Doc. 19 at 6 in CV-11-554-PHX-LOA)

1 beneficiary. (*Id*., ¶¶ 4-5, 18) After disputes arose over the entitlement of Gilbert Ramos' life
2 insurance proceeds, Liberty Life filed an interpleader action on March 24, 2011, pursuant to
3 Rule 22, Fed.R.Civ.P., and 28 U.S.C. § 2201.[4] *Id.*  Liberty Life alleged it was "an innocent
4 stakeholder that face[d] the threat of duplicative litigation and inconsistent liabilities
5 regarding the Proceeds because of the conflicting claims of the Defendants and, accordingly,
6 it cannot safely pay the Proceeds to any of the adverse claimants." (*Id*., ¶ 27)  On July 25,
7 2011, Liberty Life deposited the amount of $102,943.12, the principal amount of Gilbert's
8 life insurance policy plus $2,943.12 in accrued interest, into this District Court's registry.
9 (Doc. 18)

10 On January 3, 2012, the Court granted Liberty Life's Revised Motion for Dismissal
11 and Discharge and dismissed Liberty Life from this action with prejudice. (Doc. 53) Liberty
12 Life was discharged from any further obligation and liability to any person, whether a party
13 herein or not, with respect to Gilbert Ramos' life insurance policy with Liberty Life, Policy
14 No. NF3-39621478. (*Id.* at 9-10) After Liberty Life discounted its attorneys' and paralegals'
15 fees and, pursuant to Ninth Circuit precedent, the Court awarded Liberty Life its fees and
16 costs in the sum of $13,955.80. (*Id.*)

17 With the skilled and gentle assistance of Magistrate Judge Michelle H. Burns at an
18 emotionally-charged settlement conference in late November, 2011, the parties reached an
19 amicable settlement, apportioning the residual interpled funds and accruing interest amongst
20 the claimants. (Docs. 48, 60) As of February 7, 2012, the combined *res* amounted to
21 $151,105.52. (Doc. 66) The claimants agreed to a distribution of the following gross
22 amounts before payment of their attorneys' fees and costs: 1) $43,000.00 allocated between
23 Maria Gonzalez ($16,500) and Marivel Ramos ($26,500); 2) $50,000 to Devon Ramos,

---

[4] Devon Ramos and Christopher Dunagan, Gilbert's sons from a prior relationship, were not named as potential claimant's to Gilbert's life insurance proceeds in Liberty Life's interpleader action and made no claim to such proceeds. (Doc. 1 in CV-11-554-PHX-LOA)

- 4 -

1   Gilbert's adult son; and 3) $58,105.52[5] to K.T., but payment would be made to J.R.
2   Thompson, solely for K.T.'s benefit, in his capacity as her sole custodial parent and
3   conservator.

4   At the final settlement approval hearing, evidence was presented that, on December
5   13, 2010, J.R. Thompson filed a Petition for Permanent Appointment of Conservatorship of
6   a Minor in the Maricopa County Superior Court, Case No. PB2010-91268, requesting he be
7   appointed K.T.'s conservator because she "owns money or property that requires
8   management or protection[.]" (hearing Exh. 1) The petition was granted on January 6, 2011
9   by Superior Court Commissioner Kirby Kongable, appointing J.R. Thompson as K.T.'s
10  conservator to serve without a bond. (*Id.*) The appointment order requires K.T.'s funds "be
11  deposited in [Maricopa County], in a federally insured, interest bearing account titled 'The
12  Estate of [K.T.], a Minor, by [J.R. Thompson], Conservator.'" (*Id.*)

13  Similarly, evidence was presented at the February 2, 2012 hearing that Marivel
14  Ramos petitioned the Maricopa County Superior Court, Case No. PB2012-90038, on
15  January 17, 2012, requesting she be appointed Maria I. Gonzalez' guardian and conservator
16  because her mother, Maria, is an incapacitated and protected person, as defined by Arizona
17  law, and is "receiving funds from a settlement of a case in the U.S. District Court [in] Phx.
18  Az[.]" (hearing Exh. A) Evidence was introduced that the required notices have been

---

[5] The minor, through both her conservator and attorney, agreed to incur the discrepancy, approximately $54.52 as of January 27, 2011, between the amount that was believed to be held by the Clerk and what actually was held by the Clerk. (Doc. 60 at 2) In exchange, all counsel agreed that should any additional interest accrue on the interpled funds prior to its conclusion, the additional interest shall be added to the amount that K.T. receives. (*Id.*)

According to the Clerk's Financial Administrator, a request for funds deposited in the District Court of Arizona's registry can only be made on a Wednesday. Under the federal Court Registry Investment System ("CRIS"), money deposited in every district court case is pooled with the money on deposit with the Treasury, with a credit back to all district courts with funds in CRIS, which is used to purchase Government Account Series securities through the Bureau of Public Debt. See 28 U.S.C. §§ 2041, 2045; *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1308 n. 5 (9th Cir. 1990). CRIS operates on a weekly cycle tied to a Thursday maturity date of these securities.

- 5 -

provided and an appointment hearing is scheduled for March 27, 2012 to consider Marivel Ramos' Petition. (*Id.*)

The minor, K.T., and her father, as her conservator, are represented by counsel employed by The Never Again Foundation, a § 501(c)(3) non-profit legal charity, located in Phoenix. (Doc. 57-2, ¶ 4 at 1-2) The Never Again Foundation provides free legal representation to surviving families in civil domestic violence death cases filed directly against the offenders or killers.[6] (*Id.*) The affidavit of K.T.'s senior litigation attorney, R. Keith Perkins, indicates he is admitted to practice law in the Arizona state courts and the United States District Court for the District of Arizona with "[n]ineteen years of litigation experience, most of which is representing crime victims in complex civil litigation[]" and details his experience in this specialized area as a crime victim's rights' litigator, teacher, lecturer, award winner and writer. (*Id.*, ¶¶ 4-5.4 at 2-3) He avers the "fair market value" for a civil litigation attorney with his comparable experience, expertise, accomplishments, and background is $350.00 per hour and "the number of attorney hours expended representing [his] client in this case exceeds 100 hours." (*Id.*, ¶¶ 6-7 at 3) Plaintiffs' request court approval of an award of attorneys' fees in the amount of $14,526.38, which counsel claims is "justified, fair, reasonable, and in the best interests of the client, K.T." (*Id.*, ¶ 6 at 3; doc. 66 at 2) Mr. Perkins' affidavit also sets forth the legal authorities establishing that non-profit organizations may properly receive an award of attorney's fees. *See*, *e.g.*, *Blum v. Stenson*,

---

[6] The Never Again Foundation represents itself as "a non profit legal charity that helps families nationwide who have lost a loved one to domestic violence. We prevent killers from financially profiting from murder." http://www.neveragainfoundation.org (last visited on February 5, 2012). Its funding is "primarily from two sources: 1) a grant which originates from the United States Department of Justice, locally administered by the Arizona Department of Health Services; and 2) donations of successful clients who voluntarily pledge to donate 25% of any settlement or judgment . . . ." (Doc. 57 at 3) "[K].T., through J.R. Thompson, pledged to donate 25% of any collectible amount to the Never Again Foundation as a donation to assist the next victim behind K.T." (*Id*. at 4) The 25% donation equates to $14,526.38, as of February 7, 2012. (Doc. 66 at 2)

465 U.S. 886, 895 (1984) ("reasonable fees" under fee-shifting statutes, such as 42 U.S.C. § 1988, "are to be calculated according to the prevailing market rates in the relevant community, regardless of whether the plaintiff is represented by private or nonprofit counsel.") (footnote omitted); *Nadarajah v. Holder*, 569 F.3d 906, 916 (9th Cir. 2009) (Even though it is a non-profit organization, "[t]he ACLU's representation of Nadarajah at no charge, pursuant to the retainer agreement, does not preclude awarding reasonable attorneys' fees under EAJA, including the requested prevailing market rates."). Similarly, the Court has previously awarded a modest amount of attorneys' fees and costs to the two stakeholders in this case pursuant to Ninth Circuit authority. *See*, *Liberty Life Assur. Co. of Boston v. Ramos*, 2012 WL 10184, * 3-5 (D.Ariz. January 3, 2012).

Marivel Ramos, Maria Gonzalez, and Christopher Dunagan are represented by Harry P. Friedlander, an attorney licensed to practice in the State of Arizona. (Doc. 65) Significantly, his affidavit fails to provide any information about his experience, expertise, accomplishments, and background as an attorney for the Court to evaluate the reasonableness of his requested fees and costs. Because Mr. Friedlander did not file a narrative application or motion, including a "memorandum of points and authorities in support of a motion for award of attorneys' fees's . . . .", LRCiv 54.2(c), and his sealed affidavit does not supply sufficient information needed to determine the reasonableness of his requested fees and costs, consistent with LRCiv 54.2(c)(3), (d)(2) and (4), and how those fees and costs are apportioned between his clients, the Court will not award any attorney's fees and costs to Mr. Friedlander until after he submits of an application and supplemental affidavit of attorney's fees in compliance with these specific Local Rules.[7]

---

[7] Mr. Friedlander need not resubmit duplicative times sheets and his application and supplemental affidavit may, but need not, be filed under seal. However, his application and supplemental affidavit must be in text-searchable format as required by the Local Rules and ECF Manual and shall use the correct case number and initials unlike the affidavit at docket no. 65.

- 7 -

## II. Applicable Law

### A. Guardians *Ad Litem*

Once a federal action is commenced, it must be prosecuted in the name of the real party in interest. *Gonzalez v. Ariz. Dep't of Health Servs.*, 2009 WL 383535, * 1 (D.Ariz. Feb.13 2009) (quoting Rule 17(a)(1) (providing an exception for legal guardians, *inter alia*)); *see also* 6A also Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1548, at 373-74 (2d ed. 1990) ("A guardian *ad litem* . . . is a nominal party only; the ward is the real party in interest. . . ."). Rule 17(c)(2) provides that

> [a] minor or an incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem. The court must appoint a guardian ad litem--or issue another appropriate order - to protect a minor or incompetent person who is unrepresented in an action.

Rule 17(c)(2). A minor's or incapacitated person's representation by an attorney only is insufficient to satisfy the requirements of Rule 17(c). *U.S. v. 30.64 Acres of Land, More or Less, Situated in Klickitat County, State of Wash.*, 795 F.2d 796, 805 (9th Cir. 1986) (noting, in part, that the absence of guardian *ad litem* effectively precludes the possibility of a binding contract of settlement because of the incompetency of one of the parties); *Watson v. County of Santa Clara*, 468 F.Supp.2d 1150, 1155 (N.D.Cal. 2007) (dismissing without prejudice actions brought by plaintiff minors because no guardian *ad litem* was formally appointed by the court).

"As a general rule, a federal court cannot appoint a guardian *ad litem* in an action in which the infant or incompetent already is represented by someone who is considered appropriate under the law of the forum state." *Hogan v. Fresno County Sheriff's Deputy Robinson*, 2005 WL 2064113 (E.D.Cal. Aug 24, 2005) (quoting *T.W. by Enk v. Brophy*, 124 F.3d 893, 896 (7th Cir. 1997); *Developmental Disabilities Advocacy Center, Inc. v. Melton*, 689 F.2d 281, 286 (1st Cir. 1982)); *see also* 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1570, p. 497 (2d ed. 1990)). A district court is "obligated to abide by the State's determination of who shall represent the

1  incompetent . . . [and the court's] power to appoint under Rule 17(c) should not be used to
2  circumvent the mandate in Rule 17(b) to observe state law." *Id.* (quoting *Wolfe v. Bias*, 601
3  F.Supp. 426, 427-28 (S.D.W.Va. 1984) and citing *Brophy*, 124 F.3d at 895).

In a federal action, a district court has the discretion and authority to remove a guardian *ad litem* or state-appointed conservator[8] to protect the best interests of a minor or incapacitated person "as federal, not state law, governs the appointment of guardian *ad litem* in federal court." *Hulstedt v. City of Scottsdale*, 2011 WL 772387, * 2 (D.Ariz. March 1, 2011) (citing *Estate of Escobedo v. City of Redwood City*, 2006 WL 571354, * 7 (N.D.Cal. March 2, 2006) ("The actual appointment process of guardians *ad litem* remains procedural, and therefore, state rules do not apply to cases brought in federal courts.") (citing *Gibbs v. Carnival Cruise Lines*, 314 F.3d 125, 134-35 (3rd Cir. 2002)).

A person may gain standing to sue as a guardian *ad litem* on behalf of a minor or incompetent person if he or she can both "(1) provide an adequate explanation, such as inaccessibility, mental incompetence, or other disability, why the real party in interest cannot appear on his own behalf to prosecute the action; and (2) be truly dedicated to the best interests of the person on whose behalf he or she seeks to litigate and have some significant relationship with the real party in interest." *Gonzalez*, 2009 WL 383535 at * 1 (quoting *Miller ex rel. Jones v. Stewart*, 231 F.3d 1248, 1251 (9th Cir. 2000)); *see also Matter of Guardianship of Kelly*, 184 Ariz. 514, 910 P.2d 665 (Az.Ct.App. 1996) (appointing an independent third party as guardian rather than one of the ward's adult children because clear and convincing evidence supported the court's determination that the ward was incapacitated and in need of a guardian.). The ultimate decision whether to appoint a guardian *ad litem* or retain a state-appointed conservator rests with the sound discretion of the district court and

---

[8] Regardless whether the label is guardian *ad litem*, conservator, or next of friend, "[t]he duties and powers of a minor's [or incapacitated person's] representative in litigation are of course identical regardless of which title appropriately applies." *Dacanay v. Mendoza*, 573 F.2d 1075, 1076 n. 1 (9th Cir. 1978).

- 9 -

1 will not be disturbed unless there has been an abuse of its authority. *Sam M. ex rel. Elliott v. Carcieri*, 608 F.3d 77, 85 (1st Cir. 2010) (quoting *Melton*, 689 F.2d at 285); *Hoffert v. General Motors Corp.*, 656 F.2d 161, 164 (5th Cir. 1981); *see also In re Guardianship of Kelly*, 184 Ariz. 514, 518, 910 P.2d 665, 669 (Az.Ct.App. 1996) (The trial court "has wide latitude to perform its statutory duty to safeguard the well-being of the ward.").

**B. Arizona Probate Laws**

In 1973, Arizona adopted the Uniform Probate Code ("UPC"), A.R.S. §§ 14-1101 to 14-7308. *Matter of Estate of Mason*, 190 Ariz. 312, 313, 947 P.2d 886, 887 (Az.Ct.App. 1997). Over the years, there have been numerous statutory changes.[9] "The basic purpose of the UPC is to simplify and clarify the law concerning the affairs of decedents [minors and incapacitated wards], to discover and make effective the intent of a decedent in the distribution of his property, and to promote a speedy and efficient system for liquidating the estate of the decedent." *UNUM Life Ins. Co. of America v. Craig*, 200 Ariz. 327, 332-33, 26 P.3d 510, 515-16 (Ariz. 2001).

Arizona's probate laws are designed, in part, to protect and preserve the assets and finances of a minor[10] or an incapacitated ward.[11] *In re Guardianship of Sleeth*, 226 Ariz. 171, 244 P.3d 1169, 1175 (Az.Ct.App. 2010) (Arizona's statutes provide that "a conservator is

---

[9] For example, "[t]he original version of the UPC provided for no accounting from the conservator except upon resignation or removal or upon express direction from the court." *Estate of P.K.L. v. J.K.S.*, 189 Ariz. 487, 492 n. 3, 943 P.2d 847, 852 n. 3 (Az.Ct.App. 1997) (citing UPC (8 U.L.A.) § 5-418 (1969)). "Apparently, the drafters of the UPC have found that it is more prudent to require annual accounting and amended section 5-418 to that effect in 1987." *Id.*(citing A.R.S. § 14-5419(A)).

[10] Of course, a "minor" is "[a] person who is under eighteen years of age." A.R.S. § 14-1201(33).

[11] "'Ward' means a person for whom a guardian has been appointed." A.R.S. §§ 14-5101 and 14-1201(60).

- 10 -

to act as a fiduciary and shall observe the standard of care applicable to trustees as described by §§ 14–10804 and 14–10806[,]" citing A.R.S. § 14–5417 (Supp. 2010)); *In re Guardianship of and Conservatorship for Rodden*, 2011 WL 1998404, * 3 (Az.Ct.App. 2011) ("Guardians are charged with making broad care decisions and are responsible for the care of the protected person's personal effects."). There are distinct differences in Arizona between the powers conferred upon conservators and guardians. "Guardians have the duty to make broad care decisions for the wards in their care and are required to care for their wards' personal effects, including their vehicles. A.R.S. §§ 14-5209, -5312 (2005). In contrast, conservators only have the power to make decisions related to the pecuniary interests of their wards. A.R.S. §§ 14-5424 (2005), -5425 (Supp. 2007)." *In re Conservatorship for Geake*, 2008 WL 2352481, * 2 (Az.Ct.App. June 5, 2008). The powers and duties of an Arizona guardian[12] are set forth in A.R.S. § 14-5312 (2005) and for a conservator[13] in §§14-5417 and 5424 (2005). *Sleeth*, 226 Ariz. 171, 244 P.3d at 1175.

Among the many powers conferred upon a conservator by Arizona law is the authority "*with court approval* to compromise a personal injury or wrongful death claim for a protected person[.]" A.R.S. § 14-5424(D[14]) (emphasis added). Conservators, like other

---

[12] "'Guardian' means a person who has qualified as a guardian of a minor or incapacitated person pursuant to testamentary or court appointment but excludes a person who is merely a guardian ad litem." A.R.S. § 14-1201(23). Under Arizona law, a '[g]uardian ad litem' means a person who is appointed pursuant to § 14-1408." A.R.S. § 14-1201(24).

[13] "'Conservator' means a person who is appointed by a court to manage the estate of a protected person." A.R.S. § 14-1201(9).

[14] A.R.S. § 14-5424(D) provides as follows:

A conservator may act with court approval to compromise a personal injury or wrongful death claim for a protected person. The conservator may act with court approval to release an alleged tortfeasor if the release is in the best interest of the protected person. If the conservator obtains an order of approval for compromise from a court of competent jurisdiction, the compromise may be in exchange for a

- 11 -

"fiduciaries and those hired to assist them, [must] act with prudence when dealing with the property of another and [should] expect that their actions will be scrutinized in light of their obligations to preserve and protect." *Sleeth*, 226 Ariz. 171, 244 P.3d at 1175; *see also Geake*, 2008 WL 2352481 at * 2 (A conservator "[i]s under a duty to act for the benefit of the other as to matters within the scope of the relation.").

Arizona law provides that "a court may appoint a guardian when it is satisfied by clear and convincing evidence that the proposed ward is incapacitated, the appointment is necessary to provide for the ward's demonstrated needs and that such needs cannot be met by less restrictive means." *In re Guardianship and Conservatorship of Rango*, 2009 WL 325330, * 3 (Az.Ct.App. February 10, 2009) (citing A.R.S. § 14-5304)). A guardian of an incapacitated person[15] has the same broad powers, rights, and duties respecting the guardian's ward that a parent has respecting the parent's unemancipated minor child, except that a guardian is not liable to third persons for acts of the ward solely by reason of the guardianship. A.R.S. § 14-5312(A).

Arizona's statutory scheme governing guardians and conservators authorizes an award of reasonable attorney's fees. *Sleeth*, 244 P.3d at 1172 (citing A.R.S. §§ 14–5314(A) and 14–5414(A)). However, Arizona courts "[e]ndorse [attorney fee-reducing] suggestions and encourage fiduciaries and attorneys to diligently search for ways to increase efficiency and to employ cost-reducing measures that will preserve as much as possible the protected

---

> lump sum amount or an arrangement that defers the receipt of part or all of the consideration for the compromise until after the protected person reaches majority and may involve a structured settlement or the creation of a trust on the terms that the court approves for any protected person.

A.R.S. § 14-5424(D) (1998); *see also* UPC § 5-423.

[15] An incapacitated person means "'any person who is impaired by reason of mental illness, mental deficiency, mental disorder . . . except minority, to the extent that [s]he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning his person.'" *Rango*, 2009 WL 325330 at * 3 (quoting A.R.S. § 14-5101(1)).

- 12 -

person's estate. Obviously, fiduciaries and their attorneys must avoid the pursuit of pyrrhic victories that accomplish little but to bankrupt the protected person." *Id.* at 1174.

### C. The Court's Duty to Protect

"It has long been established that the court in which a minor's claims are being litigated has a duty to protect the minor's interests." *Salmeron v. United States*, 724 F.2d 1357, 1363 (9th Cir. 1983). "In the context of proposed settlements in suits involving minor plaintiffs, this special duty requires a district court to 'conduct its own inquiry to determine whether the settlement serves the best interests of the minor.'" *Robidoux v. Rosengren*, 638 F.3d 1177, 1181 (9th Cir. 2011) (quoting *Dacanay v. Mendoza*, 573 F.2d 1075, 1080 (9th Cir. 1978)). A district court should also be "mindful of the need to protect the rights of the mentally incompetent[,]" *Ferrelli v. River Manor Health Care Ctr.*, 323 F.3d 196, 201 (2d Cir. 2003), and is "under a legal obligation to consider whether [an incompetent] person is adequately protected." *30.64 Acres of Land*, 795 F.2d at 805 (citing *Roberts v. Ohio Casualty Insurance Co.*, 256 F.2d 35, 39 (5th Cir. 1958)). Whether federal or state, "[j]udges play a vital role in fulfilling the [Arizona] legislature's intent to safeguard those in need of the protection of conservators and guardians." *Sleeth*, 244 P.3d at 1175.

In reviewing a proposed settlement, a district court should consider "whether the net amount distributed to [a] minor plaintiff [or incompetent person] in the settlement is fair and reasonable, in light of the facts of the case, the minor's [or incompetent person's] specific claim, and recovery in similar cases." *Robidoux* at 1182. "It is the court's order approving the settlement that vests the guardian *ad litem* [or state-appointed conservator] with the legal power to enforce the agreement." *Id*. at 1079.

**III. The Claims**

To properly assess whether the parties' settlement agreement is fair and just for K.T. and Maria Gonzalez, the Court will discuss the various claims or theories of liability if this action or a separate action went to trial.

As previously mentioned, two different funds were separately interpled - Gilbert Ramos' AMF 401(k) retirement plan and Liberty Life's $100,000.00 life insurance policy.

- 13 -

1   Both interpleader actions were consolidated into this single case because of the similarities
2   between the incident, the decedent, and the potential claimants to the funds, totaling
3   $151,105.52 on February 7, 2012.

4         The distribution of the AMF 401(k) proceeds is governed by the specific terms of the
5   AMF 401(k) plan, which were quoted in AMF Bowling's interpleader complaint: "Paragraph
6   7.3 of the Plan provides that if the employee is married at this death, the spouse is
7   automatically the beneficiary." (Doc. 1, ¶ 18 at 4) It is undisputed that at the time of Gilbert
8   Ramos' death, he was married to Sandra Ramos. Thus, according to the plan itself, Sandra
9   automatically became the beneficiary upon their marriage. Because K.T. is the sole rightful
10  heir to all of Sandra Ramos' estate and the parties agree that Marivel Ramos and Maria
11  Gonzales have no claim to these funds, K.T. is entitled to 100 percent of the residual of
12  Gilbert's 401(k) plan or $48,159.32 as of February 7, 2012.

13        The entitlement to the proceeds from Gilbert's life insurance policy is more
14  complicated. Prior to his marriage to Sandra, on March 18, 1997, Gilbert Ramos took out
15  a $100,000.00 "Five Year Renewable and Convertible Term Life Insurance Policy" with
16  Liberty Life on his life and named his sister, Marivel Ramos, as the policy's beneficiary. On
17  March 18, 2002, Gilbert renewed the policy for an additional five years, and, on May 29,
18  2004, Gilbert married Sandra. After their marriage, Gilbert again renewed his life insurance
19  policy on March 18, 2007. After Gilbert's marriage to Sandra in 2004, the policy premium
20  was paid by community property funds. The parties agree that, at least, some of the policy
21  premiums were paid by community funds of the marriage of Gilbert and Sandra Ramos for
22  the last five year term of the Liberty Life policy. There is no evidence that Sandra signed any
23  written documents waiving her community property right to receive the life insurance
24  proceeds.

25        K.T. asserts three separate legal theories in support of her entitlment to all of Gilbert's
26  life insurance proceeds. First, assuming Arizona law applied, under Arizona's community
27
28

property laws and case authorities, A.R.S. § 25-211[16], *In re Estate of Agans*, 196 Ariz. 367, 998 P.2d 449 (Az.Ct.App. 1999)[17]; *Matter of Estate of Alarcon*, 149 Ariz. 336, 718 P.2d 989 (Ariz. 1986), K.T. contends that, upon Sandra's death, Sandra's property, including her beneficiary rights to the Liberty Life insurance policy, passed to Sandra's sole surviving heir, K.T., who is entitled to receive one-half ($50,000.00) of Gilbert's life insurance benefits.

Second, if K.T. filed a wrongful death action[18] against Marivel Ramos and the Estate of Gilbert Ramos for the homicide of her mother, she would contend that Marivel was a co-conspirator with Gilbert to commit insurance fraud on Marivel's automobile insurance company so that Marivel could receive money from her insurance company for the damage to her automobile. In light of Gilbert's suicide note, K.T. would argue Gilbert killed Sandra as a direct result of her botched conspiracy to commit insurance fraud with Gilbert and the subsequent criminal investigation was the proximate cause of Sandra's death. Even assuming

---

[16] A.R.S. § 25-211(A) provides in relevant part:

> A. All property acquired by either husband or wife during the marriage is the community property of the husband and wife except for property that is:
>
> 1. Acquired by gift, devise or descent.

A.R.S. § 25-211(A).

[17] "When an insured names someone other than his or her spouse as beneficiary of a life insurance policy, disposition of the proceeds necessarily involves consideration of community property rights. When community funds are the source of premiums, as the parties have agreed here, the surviving spouse has an interest in the proceeds." *In re Estate of Agans*, 196 Ariz. 367, 368, 998 P.2d 449, 450 (Az.Ct.App. 1999) (citing *In re Estate of Alarcon*, 149 Ariz. 336, 338, 718 P.2d 989, 991 (Ariz. 1986)). "If someone other than the spouse is named as beneficiary without the spouse's consent, there is a constructive fraud to the extent that the surviving spouse does not receive half of all the community and otherwise jointly acquired property including the insurance proceeds." *Id.* (citing *Gaethje v. Gaethje*, 7 Ariz.App. 544, 549-50, 441 P.2d 579, 584-85 (Az.Ct.App. 1968)).

[18] In Arizona, children may bring a claim for the wrongful death of a parent. A.R.S. § 12–612(A).

- 15 -

that Marivel is only found comparatively negligent to a small degree, K.T. argues, it is probable that Marivel's liability to K.T. would nevertheless exceed Liberty Life's $100,000.00 policy limits.

Finally, K.T. contends, upon information and belief, that Gilbert called Liberty Life just prior to committing the murders/suicide to verify that his sister Marivel was the beneficiary on his life insurance policy. Pursuant to A.R.S. §13-2314.04 (RICO), K.T. argues that the combined acts of verifying a financial payout to his sister, and his suicide note regarding ruining his family financially, support an argument that Gilbert's actions were, at least in part, calculated to produce a financial gain for Marivel, resulting in a constructive trust of his life insurance benefits for the estate of the homicide victim, Sandra. Thus, as the sole beneficiary of the estate of Sandra Ramos, K.T. would receive all of Gilbert's life insurance proceeds.

Conversely, Marivel Ramos and Maria Gonzales contend that the distribution of Gilbert's life insurance benefits is simply a matter of contract law and they would prevail as either the primary beneficiary (Marivel Ramos) and/or the second beneficiary (Maria Gonzalez) if K.T.'s claims to Gilbert's life insurance proceeds were litigated to a conclusion. Additionally, Marivel argues that she would prevail on any claim in this action or a separate lawsuit against her under Arizona's "slayer statute,"[19] citing *Protective Life Ins. Co. v. Mizioch*, 2011 WL 3297340 (D.Ariz. August 1, 2011) and *Diep v. Rivas*, 357 Md. 668, 745 A.2d 1098, 1103 (2000).

In his individual capacity, Devon Ramos claims he was entitled to the majority of Gilbert's 401(k) retirement plan but concedes, as the personal representative of Gilbert's estate, the estate makes no claim to the Liberty Life insurance proceeds. Moreover, Devon disputes the application of Arizona's slayer statute to Gilbert's 401(k) retirement plan. It is undisputed that AMF Bowling's Complaint alleged that paragraph 15.3 of its retirement plan

---

[19] Arizona's "slayer statute" prohibits one "who feloniously and intentionally kills the decedent" from obtaining any benefits from the decedent's estate, including the proceeds of any applicable life insurance policy. A.R.S. §§ 14-2803(A) and (B)(1)(a).

- 16 -

provides that Gilbert's "plan shall be construed, enforced and administered in accordance with the laws of the Commonwealth of Virginia[,]" not Arizona law. (Doc. 1, ¶ 20 at 5)

### IV. Discussion

The Court concludes that the parties' voluntary resolution of this case is fair and reasonable. Each of the parties will receive a modest but reasonably proportionate share of the limited funds available. All agree that continued litigation to a final conclusion would be expensive with estimates that the combined attorneys' fees and costs would exceed the amount of the interpled funds. The wisdom of an early settlement guarantees the parties, not the lawyers, will financially benefit from a resolution, provides an emotional ending of immeasurable worth to this horrific tragedy and a beginning of the healing process to all the Ramos family members, and "avoid[s] the pursuit of pyrrhic victories that accomplish little but to bankrupt the protected person." *Sleeth*, 244 P.3d at 1174. A settlement now may assist K.T. in obtaining a higher education and provide a modest degree of assistance to Maria in her declining health and years whereas pursuing further litigation would be risky, lengthy, and replete with challenging legal issues, such as, choice-of-law and causation questions, and the unlikelihood that K.T. could collect a favorable judgment beyond the interpled funds.

### V. Conclusion

After considering the terms of the proposed settlement, the arguments of counsel at the February 2, 2012 hearing, the totality of the facts of these consolidated cases, and the claims and defenses that were alleged or could have been alleged, the Court finds that the parties' settlement is fair, reasonable, and in K.T.'s and Maria Gonzalez' best interests.

Based on the foregoing,

**IT IS ORDERED** that K.T.'s sealed Supplemental Motion for Approval of Minor's Settlement, doc. 57, and the sealed Stipulation for Distribution of Funds, doc. 60, are **GRANTED**. The Court approves the settlement of this action and the distribution of the proceeds as agreed by the parties. A separate distribution order has been issued to the Clerk

of Court consistent with this order. (Doc. 66) The Clerk is kindly directed to terminate this action.

      Dated this 13th day of February, 2012.

                                    Lawrence O. Anderson
                                  United States Magistrate Judge